THE PEOPLE *ex rel.* The Illinois State Bar Association, Relator, *vs.* JOSEPH A. JADRICH, Respondent.

*Opinion filed February 18, 1926—Rehearing denied April 7, 1926.*

1. DISBARMENT—*dividing fees to secure employment is contrary to public policy.* An agreement between a lawyer and a layman for a division of fees in consideration of the layman procuring the employment of the lawyer by a litigant is contrary to public policy and void.

2. SAME—*attorney will be disbarred for splitting fees with public official.* An attorney who divides with the mayor of a city his fees for spreading an assessment is guilty of highly unprofessional and immoral conduct and will be disbarred even though the mayor refused to sign the warrant for the fees until a division was made; and the fact that the services were such as might have been performed by one not an attorney does not change the situation.

HEARD, J., took no part.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

GEORGE W. FIELD, for respondent.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an information for the disbarment of respondent. The information charges he was city attorney of North Chicago from May 1, 1921, to May 1, 1923; that his salary was $20 per month, and that he was paid additional compensation for services in connection with special assessments. He was appointed city attorney by Henry Deacon, mayor of said city and president of the board of local improvements. Respondent had a partner, Elmer F. Rogan, who was engaged in the real estate and insurance business, and the mayor appointed him as commissioner to spread the assessments in three local improvements inaugurated; that when vouchers were issued for the payment of respondent and Rogan for their services in the special assess-

ment proceedings the mayor refused to sign the vouchers unless he was given a part of the money, and that respondent agreed to, and did, divide the proceeds of the warrant. The information further charges that after the respondent's term as city attorney expired he was appointed by the mayor to render services in connection with a local improvement and was allowed $778.23 for his services and expenses; that the mayor again refused to sign the warrant until respondent agreed to divide the money with him, and that respondent finally agreed to, and did, divide the money, paying the mayor $335. The information alleges the mayor is not a lawyer and performed no services in the matters mentioned, all of which respondent well knew, and that to divide the money with him was fraudulent, criminal and constituted giving what is commonly called "graft." After respondent answered, the cause was referred to Eugene M. Runyard, who was appointed a commissioner to take the proof and report his conclusions of law and fact therefrom.

The facts in substance are, that respondent was licensed to practice law in 1919 and entered into the practice in the city of North Chicago, Lake county, Illinois. In May, 1921, he was appointed by Henry Deacon, mayor of North Chicago, to the office of city attorney for said city for a term of two years. His salary was $20 per month, but the ordinances authorized the payment to the city attorney of compensation for his services when he rendered services in connection with special assessment work. His partner, Elmer F. Rogan, conducted a real estate and insurance business. During his two-year term of office respondent rendered legal services in connection with three special assessment cases. Rogan was appointed by the mayor to spread the assessments. When the work was finished a warrant was issued to Rogan for $608.18 and to respondent for $539. The warrants were issued in October, 1922. They were not signed by the mayor, and he refused to sign them unless he was given a division of the fees. Respondent ob-

jected to dividing with the mayor, and the mayor said he had been in politics a long time; that the practice was "that such stuff had got to be split with the mayor." The mayor also said Rogan would have to divide his fees as special commissioner. Respondent did not then agree but objected to the division, and the mayor did not then sign the warrants. The mayor held a note against Rogan, upon which he caused a judgment to be entered and was pressing Rogan for money. Subsequently Rogan and the mayor represented to respondent that Rogan was in pressing need of money, and in order to secure the money on the warrants respondent agreed to a division with the mayor if he would sign the warrants. It was agreed between the three men that all over and above the sum of $900 of the vouchers issued to Rogan and respondent should be deducted for expenses and stenographic hire, and the sum of $900 was to be divided equally among the three of them, and the money was divided among the parties as agreed upon. In 1923, after respondent's term as city attorney had expired, he was appointed by the mayor to spread a special assessment. After the work was completed he presented a bill to the city council for $778.23, which was allowed and a voucher issued to him. When he presented the warrant to the mayor for his signature the mayor refused to sign it unless the money was divided with him. The mayor said he would sign the warrant if respondent would give him half the proceeds. Respondent refused to do that, and said he had spent money for stenographic hire and other things and did not see why the mayor should be paid anything from the proceeds of the warrant. The mayor said it was customary to "split" such vouchers; that there were other jobs coming up. Finally respondent stated that rather than have any friction he would divide with the mayor that one time, but that would be the last. The mayor signed, and when the voucher was cashed respondent paid him $330 out of its proceeds and the further sum of $5 on account

of interest. The mayor was indicted by the grand jury of Lake county for extortion, malfeasance and collecting illegal fees. Respondent testified as a witness for the prosecution in that case to substantially the facts which we have above stated, and the transcript of his testimony was received in evidence by the commissioner who heard the evidence in this case. On the hearing before the commissioner it was stipulated that respondent had prior to the filing of the information borne an excellent reputation in the community for honesty, integrity and uprightness and that his professional reputation up to that time had been excellent.

The commissioner reported that mayor Deacon was very persistent in demanding a division of the money; that respondent did not want to make such division, and in one instance did not agree to it for four months after it was demanded; that respondent's need for money, and the need of Rogan for money, might have caused respondent to believe that there was some justification or excuse for making the first division, but after he ceased to be city attorney, with full knowledge of the mayor's views with respect to politics and division of money obtained from the city treasury, he accepted an appointment from the mayor as commissioner in a special assessment matter and was again called upon by the mayor to divide the fees received for his services and agreed to, and did, divide such fees. The commissioner found respondent has conducted himself in a manner unbecoming an attorney and counselor at law, and that his conduct in dividing the fees earned as city attorney, and as commissioner in a special assessment proceeding after he had ceased to be city attorney, was unethical and unprofessional. A supplemental report was made by the commissioner upon a hearing had upon objections of respondent, in which the commissioner reported that the evidence showed respondent sued the mayor in the county court of Lake county on April 1, 1924, for the recovery of money paid the mayor under the voucher issued for his services in

the special assessment proceeding after his term as city attorney had expired, and recovered a judgment.

There is no substantial controversy about the facts. The record discloses a phase of official conduct which is most shocking to the minds of honest citizens. Mayor Deacon said he had been in politics a long time and that it was the usual practice to "split" with the mayor in such cases. While there are too many dishonest public officials, we do not believe it is the usual custom of officers to receive bribes and collect graft in the conduct of their offices. That some officials do dishonor themselves and their offices in that way is doubtless true, but such practice has not yet become a general custom. There is no more despicable creature in existence than the public official who prostitutes his office for the collection of bribes and graft. He is a criminal, who is led to the commission of the offense not because of dire needs, which may sometime cause men to commit crime, but solely because of his cupidity and an absence of honest motives or any appreciation of his duty to the public. Ordinarily a man elected mayor of a city is supposed to be a man of good character for honesty and integrity. It can not be imagined that the moral standards of the voters of any municipality are so low that they would knowingly elect any mayor who would use the position to collect bribes and graft. There cannot among honest men be two opinions about a public officer who will resort to such corrupt practices. True, we are not here trying mayor Deacon for his crimes. He has been tried for his offenses and acquitted and is not now subject to our jurisdiction, but we are obliged to characterize his acts in order to determine whether the acts of respondent in dividing fees with him were such as require his disbarment. The mayor is not a lawyer and rendered no service in the special assessment matters and had no right or claim to a division of the fees allowed respondent. Respondent knew that. The only reason given by the mayor for demanding what he called a "split" in

the money was that it was customary in politics. He appears to have been responsible for respondent's employment in three special assessment matters while respondent was city attorney and in one special assessment matter after his term as city attorney had expired. Because of that fact, and what he claimed was the practice in such cases, the mayor demanded that respondent divide the fees with him and refused to sign the warrants until a division was agreed to, and he afterwards received a share of the money. It is to respondent's credit that he at first refused to agree to the division, and we greatly regret that he later weakened and agreed to it. He knew the only basis of the mayor's demand was that he was responsible for respondent being employed in the special assessment cases. He knew the mayor's demand was dishonest and reprehensible in the highest degree. He knew the mayor was committing a crime in demanding and receiving a part of the money. He insists, and, so far as the record shows, truthfully, that he did not procure his employment by any promise to divide with the mayor. The situation might have been worse if before he was employed he had promised to divide with the mayor, but the moral turpitude of his act is not greatly lessened by the fact that he had not agreed to a division with the mayor before he was employed.

It is claimed respondent's need for money caused him to agree to the division. The mayor was proposing the commission of a crime, and had placed himself in such a position that if respondent had possessed the moral courage he should have had, he could very quickly have caused the mayor to recede from his demands and sign the warrants. With knowledge of the first division in his mind he again accepted appointment in a special assessment matter from the mayor and again yielded to the mayor's demand and divided the money with him. We regret to say that his conduct was in a very high degree unprofessional; that it placed him in the position of at least consenting to the

commission of a crime and protecting the criminal. Later, and before this information was filed, he sued the mayor for the money paid him in the last division and recovered a judgment. It was commendable in him to bring the action, but it would have been more commendable if he had refused to agree to the division in the first place and had never been a party to it. We are impressed that a division of the fees on either occasion was repulsive to him. He had previously had an excellent reputation as a lawyer and citizen, and such an act would, of course, be offensive to that kind of a citizen and lawyer, but the fact remains that with all the advantages in his favor for refusing to make the division he consented to it and paid the mayor part of the money out of the first warrant and afterwards accepted appointment in another matter and again divided his fees with the mayor. Respondent was too tardy in realizing the position he had placed himself in by his conduct.

An agreement between a lawyer and a layman for a division of fees in consideration of the layman procuring the employment of the lawyer by a litigant is contrary to public policy and void (*Alpers* v. *Hunt*, (Cal.) 9 L. R. A. 483; *Holland* v. *Sheehan*, (Minn.) 23 L. R. A. (n. s.) 510; *Mequire* v. *Corwine*, 101 U. S. 108; *Langdon* v. *Conlin*, (Neb.) 60 L. R. A. 429;) and is ground for the disbarment of the lawyer. (*In re Evans*, (Utah) 83 A. S. R. 794.) That the division was made in this case without any previous agreement does not relieve respondent's act from being unethical and unprofessional. The division was made to induce the mayor to perform an act it was his official duty to perform, and renders the act one of greater moral turpitude than would the sharing of a lawyer's fees with a layman holding no official position but who had secured the litigant to employ the lawyer. It would be a very low standard of morals and ethics which would justify as professional the conduct of respondent. If there are any considerable number of officials who believe, as did mayor Deacon, that

such practices are customary in politics, it is time they were informed that such practices are criminal and the officers who are guilty of such practices deserve the severest penalties provided for by the statute. Respondent was not responsible for causing the mayor to make the demand for the "split," but he made the demand successful by consenting to it when he knew the act was a criminal offense under the statute. It was, as we have said, to his credit that he told the story truthfully as a witness on the trial of the mayor, but that did not change the moral turpitude of the act. It may seem unfair that the mayor be acquitted of the crime and that respondent, whose responsibility for its commission is less than that of the mayor, should be disbarred, but we are not responsible for the mayor's going unpunished. We are charged with the responsibility of determining whether the acts of respondent were so immoral and unprofessional as to justify his disbarment. We are bound to decide whether what respondent did was unprofessional, immoral and unbecoming a member of an honorable profession. If we decide it was not, then a great breach would be made in the professional and moral standards of the profession. We have no inclination to share in the responsibility for making that breach. The profession has always been regarded as an honorable one, and next in importance to maintaining the honesty and integrity of the bench is maintaining the honesty and integrity of the bar. This court desires to endeavor to the full extent of its power to sustain both, and we would be recreant to our duty and the trust reposed in us if we were to decide that respondent's acts were not immoral and unprofessional and did not require his disbarment.

The suggestion is made that the fees received by respondent as commissioner in the special assessment proceeding after he ceased to be city attorney were not attorney's fees for legal services, as the work might as well have

been done by someone familiar with that class of work who was not a lawyer. There is no merit whatever in that suggestion. Respondent divided with the mayor the fees he received for doing the work, and the act was one which no lawyer could do without bringing his profession into disrepute.

The rule is made absolute.    *Rule made absolute.*

Mr. JUSTICE HEARD took no part in this decision.