In the Matter of JAMES F. MAHAN, an Attorney, Respondent.

First Department, February 14, 1930.

*Isidor J. Kresel* of counsel [*Neilson Olcott* with him on the brief], for the petitioners.

*James F. Mahan* [*Denis Quinn* of counsel], respondent in person.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, Third Department, in July, 1896. He practiced law in the city of Troy from 1896 to 1911, when he came to New York city. He then entered the legal department of one of the accident insurance companies here, where he remained until 1917, when he opened his own office. Since 1917 he has been practicing in New York city as an attorney.

Respondent is charged with misconduct as an attorney in the solicitation of retainers in personal injury actions. His answer is a general denial. The matter was referred to a referee to take testimony in regard to the charges set forth in the petition and to report the same with his opinion thereon to this court. The referee has duly reported and the petitioners move for such action as this court may deem just and proper.

Before the referee it was stipulated that the only charges against the respondent involve those cases alleged to have been solicited by Adolph Weinberger or his son during the period when it is alleged and admitted by the respondent that they were in his employ. The dates of this employment are from on or about July 1, 1924, until on or about October 1, 1926.

Respondent testified that he had known Adolph Weinberger for several years; that while he was attorney for the insurance company he took him from the Pinkerton Detective Agency and Weinberger worked as an investigator with him in the insurance company for several years. Some years after respondent left the insurance company, and in July, 1924, respondent employed Weinberger with the sole purpose, as he testified, of securing a good, competent investigator. After respondent employed Weinberger, his business increased very substantially. This increase respondent attributed to Weinberger's activities. Respondent testified that he did not know how Weinberger was getting this business, but took it that it was through his neighbors and people belonging to lodges. Respondent inquired of Weinberger how he got his business. His testimony on that is as follows: " I told him quite a few people came there and then he said to me, he said, ' I told

you; you did not want to hire me; I told you I had a lot of friends.' And then he told me about his brother being a rabbi in a congregation up there, and that he was in a number of different organizations, and that he had lived there nearly all his life in a popular section, and people are getting hurt all the time, and he had been in the business first with the insurance companies for so long, and they merely got in the habit of coming in and asking his advice on those things." Respondent testified that Weinberger and his son were working for him; " their duties were to take every case I assigned to them from the office and put it in shape, see the witnesses, go around and do general investigating work on it." In addition to having the father and son in his employ, respondent's stenographer was a daughter of the senior Weinberger. The Weinberger home was a center for people who had claims for personal injuries. Respondent bought blank forms of retainers, and he believed the girl took these forms to her home. Prospective clients signed these retainers in the Weinberger home and they were then brought to respondent's office, and when the Weinbergers related what the clients had told them up at the house, respondent either accepted the retainer or, if the case was one he did not care to take, he gave it back to the Weinbergers with instructions to return it. Many cases were refused. · On the hearing before Mr. Justice WASSERVOGEL respondent admitted that the Weinbergers brought cases in excess of two hundred a year which were accepted by him.

The record contains testimony relating to respondent's being retained in connection with seven personal injury cases. In three of these, the Schmidt, Gedaly and Eisenberg cases, respondent was retained because of the activities of the Weinbergers before the occurrence of any of the accidents resulting in the injuries. It appears that the Weinbergers were in the habit of handing out cards with their name and " something about taking care of accidents " thereon. This distribution of cards was accompanied by the request to call Weinberger up if the recipient ever had an accident. Herman Schmidt testified that after his accident he called Weinberger up and Weinberger came to see him; that he made a statement which Weinberger took down and later, on receipt of a letter from respondent, he went to the latter's office. Schmidt was unable to recall whether he signed a retainer at the office or not. Adolph Gedaly testified that following his accident he went to Weinberger's house and later he went to respondent's office. Morris Eisenberg testified that following an accident in which his little daughter was injured, his wife said to him, " do you know any lawyer? " and Eisenberg said, " Well, that man gave

me a card once and I'll go over and see him." Weinberger told Eisenberg, "I don't do any business with Zimmerman & Zimmerman any more but he says I have another lawyer, Mr. Mahan, and I will give him the case." Eisenberg has since gone directly to respondent in connection with an injury to himself.

Mrs. Clara Landsdorf testified that she lived on Simpson street. In June, 1925, her little daughter was injured. Following the accident, the same day, Abraham Weinberger called and asked her if she wanted to give the case to a lawyer. Mrs. Landsdorf testified she had never seen Weinberger before that, but being asked if she knew how he happened to come to her house, she answered, "Yes, a neighbor knew how it happened and she said, 'I will send you up a lawyer.' It was the landlord's fault that it happened that way." Weinberger gave her a paper and she signed it. Respondent's name was on it. Later she called at respondent's office. Her claim was settled.

Harry Gilman testified that he was hurt in an accident which occurred in front or near his store at 950 Freeman street, Bronx, on July 30, 1924. It appears from the cross-examination of Gilman that he had known the younger Weinberger for some five years; knew he was an investigator and that he worked for a lawyer; that the Weinbergers called at Gilman's store and were investigating the same accident for a Mr. Johessi; that Weinberger asked about Johessi first, and it was during the course of that conversation that Gilman spoke about his own case. The following extract from the testimony is pertinent: "Q. Didn't you offer to let him have your case, then, along with the other one? A. I asked him whether this man had a lawyer and he said yes. He says to me, 'Do you want me to take your case, because I will give it to somebody I know?'" There is testimony that respondent himself called at Gilman's store and told Gilman he was his lawyer. It is clear, however, that respondent's call was made during the course of his personal investigation of the cause of the accident.

The testimony of Ralph Katz is to the effect that he was riding in an automobile with a Mr. Weiner when a truck hit them. After the accident a man approached Mr. Weiner and said something about being a witness to the accident. Katz later saw this man in respondent's office. Katz went to respondent's office with Weiner and there signed a retainer.

Garry Briskie testified that on July 7, 1924, he was sitting in an automobile in front of his garage in the Bronx, when a laundry truck ran into the car in which he was sitting and he was injured. Quite some time after, some young man, whom he had seen two or three times but who was not a friend of his, came to see him and

gave him a card. Briskie testified in response to a question by the referee, " Well, at that particular time he came in to me and asked me did I ever have any cases, and I said, ' No,' and the thing had just occurred and I said, ' I have one right now.' He said, ' All right, I will take care of it ' and that is all I heard until I received the money." The record shows that this case was settled and Briskie went to respondent's office because of notice he received. He recognized respondent as the man who was in the office. He stated that it was as a result of the talk with this young man that he gave the case to respondent.

The learned referee, in his report, states: " An appraisal of the facts before us is not without its difficulty. There is no suggestion that the respondent has been guilty of any dereliction save that he foolishly allowed the Weinbergers to solicit cases for him, and while he is entitled to be believed in his statement that he never authorized the solicitation of cases, it is unquestionably true that he knew Weinberger was soliciting them and maintained a passive attitude in relation thereto."

A member of the bar may not accept the benefit of business obtained in the manner disclosed in the record herein and escape criticism. The mere volume of the business proffered by the Weinbergers should have been sufficient to put on guard an attorney anxious to live up to the Canons of Ethics adopted for the profession. It is obvious that he knew that the Weinbergers were " touting " for him, in violation of the Canons of Ethics, and he was quite willing to profit by their activities, and did so. He was guilty of more than mere foolishness. He accepted the continuous results of the services of the Weinbergers in such proportions as must have demonstrated to any one possessed of ordinary common sense that they were actively and successfully soliciting business for him.

The respondent should be suspended from practice for the period of six months, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent suspended for six months.