In the Matter of MANLEY J. GREENWALD, an Attorney, Respondent.

First Department, May 2, 1930.

*Isidor J. Kresel* [*Sidney Handler* with him on the brief], for the petitioners.

*Lyman A. Spalding* of counsel [*Spalding & McCabe*, attorneys], for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, on June 16, 1919.

The petition charges that respondent has been guilty of misconduct as an attorney at law as follows: (a) Improper solicitation of retainers in personal injury cases; (b) failure to comply with a court order fixing his fee in an infant's case, and (c) misappropriation of a part of the funds of adult clients. Respondent answered the petition and the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon to this court. The learned referee has duly reported and the respondent moves to confirm the report and for a dismissal of the petition.

The petitioners admit that the evidence offered was not sufficient to sustain the charges of solicitation as to each of the specific instances alleged in the petition, but claim that there is sufficient evidence to sustain the general or omnibus charge of solicitation.

The record discloses that in 1920 respondent opened an office for the practice of the law on his own account, and since entering private practice has not been associated with any other lawyer or firm of lawyers. He employed his father, Harry Greenwald, who for thirty years prior to 1920 had been employed as an investigator of accident claims by the Interborough Rapid Transit Company, the New York Railways Company and the Fifth Avenue Coach Company. Harry Greenwald took charge of the investigation and preparation of cases for trial, and also procured retainers in cases where " a client would call up and not come down to the office." In 1923 respondent employed his brother, Stuart Greenwald, as managing clerk. In 1927 another brother, Eugene J. Greenwald, entered respondent's employ. His duties were to subpœna witnesses, serve papers and generally assist Stuart Greenwald. Respondent testified that on an average 200 negligence matters came into his office a year, and in March, 1928, he had on the Supreme Court calendar of New York county about 200 or 300 cases. Respondent testified that the source of this business was " Friends, people who know me, people who know my family or people in the house that know me * * * in that fashion." The increase in salaries paid by respondent to his father and brothers,

and the reductions following the institution of the Ambulance Chasing Investigation are emphasized by petitioners as being related to the increase of his negligence business and the curtailment thereof as a result of the investigation; and it is urged that the inference should be drawn that respondent's negligence business was developed by his father, who used the many contacts he had gained in his wide experience as an investigator and adjuster of accident claims for traction companies to obtain quick and speedy information regarding accidents and to influence the claims consequent thereon to the respondent's office.

To justify the inference urged by petitioners there should be some proof of activities along these lines. There is none here. The circumstances pictured in the record do not warrant the inference urged by petitioners.

The record of the testimony taken before Mr. Justice WASSERVOGEL in the Ambulance Chasing Investigation shows that respondent admitted that he had paid some consideration to various persons for recommending negligence cases to him. Before the referee, however, he attempted to change that testimony to show that the payments were not for recommending the cases but only for services which were rendered in them, such as attendance at court for the purpose of testifying, and reimbursements for loss of time and earnings. The referee gave little weight to the transcript of the testimony taken in the Ambulance Chasing Investigation, because he found that the stenographer's notes had been " touched " and there was a variation on transcripts offered, this " touching " referred to making the characters as taken down legible for transcription when the stenographer came to read his notes into a dictaphone. The stenographer was produced and testified that the " touching " was made a day or two after the taking of the notes or within a week and was made for the sole purpose of making his notes more legible. The variations spoken of, with one exception, are of no consequence. The one exception occurs in a question put to respondent, and the answer clarifies the situation. In the first transcript the question was, " Do you share your *office* with anybody else? " and the second transcript shows the question, " Do you share your *fees* with anybody else? " The answer in both transcripts is " No." The characters for the two words " office " and " fees " could be easily confused. There is no suspicion of any bias or improper motive upon the part of the stenographer. Notwithstanding respondent's denials before the referee, we are satisfied that the record of his testimony in the ambulance chasing investigation showing his admission of payments to individuals for recommending negligence cases is correct. In fact, he admits payments but only denies that they were part of his fees.

The petitioners admit that the evidence does not sustain the charge of misappropriation either in the infant's case or in the adults' cases. The circumstances involving these charges, as related in the record, are:

David Stern retained respondent to prosecute his claim and that of his infant son, Irving, arising out of an automobile accident. The infant's claim was settled for ninety dollars, and the court order allowing compromise fixed respondent's fee at thirty dollars. The parent's claim was settled for sixty dollars, out of which respondent was entitled to thirty dollars. There should have been paid to the guardian and parent ninety dollars. He received seventy-five dollars. At the same time respondent drew a check for fifteen dollars. The physician who had treated the infant had not yet been paid. Respondent had the parent indorse the check for fifteen dollars to the doctor who had rendered the medical services. It further appears that in this case the insurance company on the settlement delivered to respondent two checks, one for sixty dollars to the order of the guardian *ad litem*, and the other for ninety dollars, which represented respondent's fee in the infant's suit and the amount of the settlement of the parent's claim. Respondent, instead of delivering the sixty-dollar check to the guardian, had him indorse it and the ninety-dollar check and gave him one check for seventy-five dollars.

In the adults' cases it appears that respondent was retained to represent a group of eight workmen who had been injured through the sudden falling down the shaft of an elevator on which they were riding. Six of these claims were settled for $150, and two for $165 each. At the time they visited respondent to receive their share of the settlements, the claimants met there Dr. Harry Schneider, who had treated them at the time of the accident. Each of the claimants in the group who settled for $150 was presented with a check to his order for $12.50 and asked to indorse it to Dr. Schneider, and the two who settled for $165 each were asked to indorse to the doctor checks for $20 each. After this was done the checks were given to the doctor and each claimant received a check for the balance of his share of the settlement. Henry Ortner, manager of the factory in which these men were employed at the time, was responsible for their being treated by Dr. Schneider and also for their retaining respondent. He was present at the time of settlement and told the men the doctor would have to be paid, and it was suggested by one of the men, Ortner testified, that the checks be drawn as they were. There is testimony that respondent and this physician, Dr. Schneider, had never met until they were introduced to one another at the time of the settlement by Ortner.

The learned referee has seen fit, in his report, to express criticism of petitioners for presenting the charges of misappropriation set forth in the petition. This court does not agree with his criticism. Under all the circumstances it was the duty of the petitioners to present these charges. There was evidence that clients had received less than was coming to them under their retainers of respondent. Deductions for payment of physicians' charges made by attorneys at the time of settlement have recently been criticised by this court. (See *Matter of Fieldsteel*, 228 App. Div. 470.) But in this case we find that the payments were acquiesced in by the clients and suggested to be made by the manager of the factory, who had proposed the employment of both the doctor and the lawyer, and who had no pecuniary interest whatever in the outcome of the matter but was simply trying to see that justice was done to all concerned.

The payments made by respondent to individuals for recommending cases are opposed to a strict observance of the Code of Professional Ethics.

Respondent had been active in the prosecution of negligence cases for a period of eight years and during that time he admitted that he had given what he described as " some kind of gratuity " to perhaps six people. He said he never employed runners or chasers, but he did make payments in these isolated cases. " For instance," he testified, " a woman in a house who knew me, for whom I had tried a case, and she recommended me, and felt I should have given her some kind of gratuity — that is what I mean." He also admitted that the gratuity he gave bore some relation to the gravity of the injury sustained by the person recommended. But we do not find any systematic or continued indulgence in this practice by respondent, nor is there any proof of the amount of these payments, which might cast light on whether they were a percentage of fees received or merely what respondent terms them — a gratuity. Out of two hundred cases a year extending over a period of nine years, there is no proof of any improper payments to persons recommending cases to him, save the gratuities in these six cases or thereabouts, which were not brought out on testimony against him but by his own admission. For these payments concededly made he should be censured. · But in other respects we find no professional misconduct calling for punishment.

McAvoy, Martin, O'Malley and Sherman, JJ., concur.

Respondent censured.