(No. 38783.—

*In re* DAVID P. KRASNER, Attorney, Respondent.

*Opinion filed January 21, 1965.*

J. R. Christianson, of Chicago, *amicus curiae*.

Harry J. Busch and Jacob Shamberg, of Chicago, for respondent.

Mr. JUSTICE DAILY delivered the opinion of the court:

The Board of Managers and Committee on Grievances of the Chicago Bar Association, as commissioners of this court under Rule 59, have filed a report recommending that respondent be suspended from the practice of law for a period of five years on the basis of findings that he had unethically engaged in conduct which constituted a division of fees with laymen and the employment of solicitors to procure law business. Respondent, a 50-year-old practitioner who was admitted to the bar of this State in 1938, has filed exceptions to the report contending there is no evidence to support such findings.

The disciplinary proceeding was an outgrowth of an indictment returned to a Federal district court wherein a man named David E. Vogele was charged with evasion of income tax. He pleaded guilty, and at a hearing on the matter of his punishment it came to light that he was a professional "ambulance chaser" and that the source of his unreported income had been payments from some twenty lawyers, of whom respondent was one. The trial judge, by a letter of February 20, 1963, brought the matter to the attention of the Chicago Bar Association and as a consequence an inquiry was made and a complaint filed against respondent. At the hearing which followed, the evidence on behalf of the complainant association consisted only of the testimony of respondent and his partner, and certain ledger sheets and cancelled checks of the partnership. For the respondent, two judges, numerous attorneys and a businessman testified to his good character and reputation and to his professional integrity.

Since, as we have said, the complainant's proof rested almost entirely upon the testimony of respondent and his partner, there is no dispute as to the facts and what follows is largely a summation of their statements at the hearings. During the years 1957, 1958 and 1959, respondent, in partnership with his brother-in-law, engaged in a general prac-

tice and handled personal injury work. And while the charges of his professional misconduct center principally around his dealings with Vogele, respondent testified that he had known a man named Paul Skidmore prior to meeting Vogele, that Skidmore "might have recommended a case or two," and that he, respondent, remembered a few "isolated instances" in which he had paid Skidmore "gratuities" for the cases referred. At another point in his testimony, respondent gave a less positive answer, and stated that he "may have" given Skidmore a check, considered by the witness to be a "gratuity."

To avoid future repetition, it may be stated respondent repeatedly testified he considered that all payments made to Skidmore, Vogele and others who had referred business to him, were voluntary gratuities, or gifts, and expressly denied that they were investigational fees or commissions paid pursuant to agreement.

Describing his first meeting and transaction with Vogele, respondent said they had been introduced at lunch sometime in the Spring of 1957, and that during the course of the conversation he had told Vogele, in response to the latter's inquiries, that he was an attorney and that he had done personal injury work. When asked if he had ascertained Vogele's occupation, respondent replied: "* * * as I recall he was a man with a lot of connections and the thing that I remember with some particularity is the fact he made some reference he is (sic) connected with, in some sort, with the insurance field, insurance business or something like that." Respondent couldn't recall if Skidmore was present, or who made the introduction, and stated that it was a chance meeting and that he was unaware that Vogele was a person who sought out personal injury cases for profit. However, at another point in his testimony, he said he "guessed" that it was Skidmore who had introduced him to Vogele. Shortly after this meeting, by respondent's version, he was retained by a client in a case, then subsequently re-

ceived a telephone call from Vogele who represented that he had referred the client and said: "I took care of you, and perhaps you could do something for me." Respondent's recollection was that he gave Vogele a check as a gratuity, but he could not recall the amount. Vogele, as he did on subsequent occasions, came to respondent's office for the check.

Respondent conceded that his relationship with Vogele continued until the middle of 1959, when respondent purportedly terminated it because Vogele proposed to "chase a case." During this period, by respondent's admission, Vogele referred some 70 to 75 cases, and it was likewise conceded that Vogele had been paid "gratuities" of approximately $7,295 in 1959, approximately $10,000 during 1958, and $6,000, "more or less," in 1957. In excess of 100 checks, totalling the above amounts, were drawn on the partnership account and were made payable either to Vogele directly, or to cash, or, in two instances, to Skidmore at Vogele's direction. Incredibly, respondent testified that the pattern for each transaction was the same as the first, (*i.e.* that Vogele would telephone and claim to have referred a certain client,) and that he took no steps to verify whether the client had in fact been referred by Vogele, but took the latter's word for it and paid him a gratuity. This testimony, we are constrained to remark, makes it difficult to see why in excess of 100 checks were necessary to pay for only 70 to 75 of the so-called referrals, particularly since respondent also testified he could not recall giving more than one gratuity to Vogele in any case.

The size of the gratuity in a given case depended upon what respondent "thought the case was worth." Further, he stated that in no instance had a client been charged with any of the sums received by Vogele, and ledger sheets in evidence disclosed that all checks made payable to cash were charged to respondent and his partner, one-half to each, as part of their drawing accounts. Checks made payable to Vogele by name were treated as a business expense and de-

ducted for income tax purposes; those payable to cash were not so deducted.

When asked if he had paid "gratuities" to any other persons for the referral of personal injury cases during the years of 1957, 1958 and 1959, respondent temporized that "if a person or client would refer a case I would make a gratuity," and then stated he could recall no individual who had received more than two or three gratuities in those years. Again, upon being queried about "gratuities" given since the termination of his relationship with Vogele, respondent replied that he had paid some on occasion, but not as many, and explained that he felt the payment of a cash gratuity was no different from the giving of a gift of clothing or something similar. No records were kept of any of the gratuities given, and respondent stated that individual case or client records likewise contained no reference to gratuities or to the person to whom they were given. Respondent promised to look for and present case files involving clients sent to him by Vogele, provided they had not been destroyed, but we find no indication that any such files were ever placed at the disposal of the commissioners. It is axiomatic that an attorney whose conduct is questioned must appear for examination under oath, and must submit for examination whatever records are in his possession relevant to the inquiry. *In re Royal*, 29 Ill.2d 458, 460.

At all times in question Canon 28 of the Canons of Ethics of the Chicago and State bar associations provided in part: "* * * it is disreputable to * * * breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office * * *." Also, Canon 34 provided: "No division of fees for legal services is proper except with another lawyer, based upon a division of service or responsibility."

Based upon the evidence substantially as related, it was the finding of the commissioners that respondent had violated these canons.

Anchoring his argument to the frequently expressed principle that charges in a disciplinary proceeding must be sustained by clear and convincing proof, (*e.g. In re Donaghy,* 402 Ill. 120, 124,) respondent contends there is no proof that Vogele, Skidmore or any other person actually solicited any cases, or that respondent had any knowledge they were doing so, and as a consequence no evidence that business was ever solicited by respondent or by others in his behalf. His theory seems to be that without direct testimonial evidence of solicitation, either by Vogele or Skidmore or the persons solicited, the proof against him is neither clear nor convincing. We do not agree. Circumstantial evidence is legal evidence and neither the commissioners nor this court are required to be naive or impractical in appraising an attorney's conduct. In this particular case, we need not remain blind or insensitive to the reasonable and clear cut intendments arising from respondent's own admissions and business records.

Reduced to its simplest terms, and without regard to the transactions with Skidmore and others, the proof shows that during a period of about two and one-half years Vogele referred some 70 to 75 cases to respondent, all being personal injury cases except for "a divorce or two," and was paid sums totalling in excess of $20,000 for such referrals. And while respondent indulges in semantics and describes the payments as gifts or gratuities, it is clear that such payments, regardless of the label appended to them, were in fact remuneration for law business sent to respondent. (*Cf. In re Greenwald,* 241 N.Y.S. 703, 707.) In short, the reasonable intendment from the evidence is a systematic referral of cases by Vogele, and the payment of a fee for each referral. And before turning to the matter of solicitation, we are constrained to remark that even if respondent's

payments to Vogele and others were considered to be "gratuities" in the true sense of the word, such conduct is highly unprofessional and fraught with possibilities of evil, inasmuch as such payments could serve as an inducement to the recipients to seek out or stir up litigation in the hope of obtaining further gratuities. See: *In re Mitgang,* 385 Ill. 311, 332-333; *In re Littick,* 232 N.Y.S. 571.

Even if we accept as true respondent's statement that he did not know of Vogele's reputation and profession, we think it unquestionable respondent knew cases were being solicited and that he was quite willing to profit by Vogele's activities. As was observed in the case of *In re Mahan,* 239 N.Y.S. 392, under comparable facts, the mere volume of business referred from a single individual should have made it obvious to respondent that there was active solicitation of cases rather than innocent recommendation, and we have here the added circumstance that the bulk of the cases were personal injury actions. Yet, despite these unusual circumstances, respondent made no inquiry and, as was true of the attorney in *Mahan,* accepted the continuous results of Vogele's services "in such proportions as must have demonstrated to any one possessed of ordinary common sense" that Vogele was "actively and successfully soliciting business for him." (239 N.Y.S. at 396.) At the time of these transactions respondent was an attorney with twenty years experience. According to his witnesses he was a capable practitioner, and most certainly was not oblivious to what was going on. It is our opinion that the proof supports the charge of solicitation through others and shows respondent's acquiescence in their activities. *Cf. State of Oklahoma ex rel. Oklahoma Bar Assn.* v. *Woodard,* 362 P.2d 960, 963; *In re McKee,* 229 Ore. 67, 365 P.2d 120; *In re Kreisel,* 250 N.Y.S.2d 1001; *Columbus Bar Assn.* v. *Agee,* 175 Ohio St. 443, 196 N.E.2d 98.

Equally without merit is respondent's rationalization that there is no proof to support the charge that he had

divided fees with laymen, first, because there was no direct evidence that he had in fact collected a fee in any case referred by the recipients of his "gratuities," and second because the proof shows that all payments were made to Vogele and others before the particular case was ever tried or settled. As to the first premise, it is enough to say it is beyond human experience and belief that respondent would have been generous to the extent of an amount in excess of $20,000 had not fees been realized from the cases sent to him by Vogele and Skidmore. As to the second, there is no validity in the distinction respondent seeks to make. Whether payment was made before or after respondent realized his fees is meaningless. (*In re Thompson,* 30 Ill.2d 560.) Respondent testified the "gratuities" were "based upon what, in my opinion, the case was worth." Necessarily he meant what it was "worth" to him in the matter of fees, and his payments were clearly a division of fees anticipated or later realized. As already pointed out, characterizing the payments as "gratuities" does not alter the fact.

We are satisfied the proof fully supports the charges and findings against respondent, and are likewise of the opinion that the Canons of Ethics have been violated and that discipline is warranted. Although canons of ethics adopted by bar associations are not binding obligations, nor enforcible by the courts as such, they constitute a safe guide for professional conduct and an attorney may be disciplined for not observing them. (*In re Heirich,* 10 Ill.2d 357.) And while neither the solicitation of law business nor the division of fees here involved imports venality, fraudulent practices or moral turpitude, they are nevertheless practices which have long been condemned as a blight upon the legal profession.

After some vascillation between suspension and disbarment, the Grievance Committee of the Chicago Bar Association recommended that respondent be disbarred from the practice of law. The Board of Managers, however, did not

concur and in its report has recommended that he be suspended from practice for a period of five years. Such recommendation is, of course, purely advisory, inasmuch as we are regarded as a court of initial hearing in a case of this kind, (*In re McCallum,* 391 Ill. 400,) and the question now becomes what disciplinary measure is warranted by the evidence presented, bearing in mind that the purpose of such a proceeding is not punishment *per se* but the protection of the public from further misdeeds and the preservation of the high standing and reputation of the bar, (*In re Power,* 407 Ill. 525,) and that each case of this character must be considered on its own particular facts. (*In re Smith,* 365 Ill. 11.) Indeed, dependent upon the circumstances involved, the discipline meted out by this court for solicitation has ranged from disbarment. (*In re McCallum,* 391 Ill. 400,) to suspension, (*In re Veach,* 1 Ill.2d 264,) to censure, (*In re Cohn,* 10 Ill.2d 186,) while misconduct amounting to an improper division of fees has provoked suspension, (*In re Hamilton,* 388 Ill. 589; *In re Browning,* 23 Ill.2d 483,) and disbarment. *People ex rel. Illinois State Bar Assn.* v. *Jadrich,* 320 Ill. 344.

We need not labor the point that solicitation or ambulance chasing, so-called, either directly or indirectly through the services of runners or others, is conduct which is reprehensible and inimicable to the traditions and best interests of the legal profession. Not only does it provoke derision and disrespect in the eyes of the public, but it is an overreaching of the other members of the profession who adhere to the standards fixed by canons of ethics and the dictates of good conscience. To permit such conduct to continue undeterred could only result in unsavory competitions and consequences materially detrimental to the dignity and honor of the legal profession as a whole. The division of fees which follows as a natural outgrowth of solicitation or ambulance chasing is equally reprehensible and harmful in that it encourages and promotes further solicitation. This is not

a case where respondent operated openly, either by himself or through a known employee or investigator, but one in which the operation was clandestine to a degree, and one which might have gone undetected had not Vogele's activities come to the attention of the income tax authorities. That it was a profitable system to respondent is borne out by the extent to which Vogele profited from their relationship. The entire evidence demonstrates an utter departure from the standards of honesty and integrity required of a member of the bar.

In imposing discipline we are not unmindful of its effect on respondent's professional future, nor do we overlook the testimony of his character witnesses or the circumstance that he co-operated with the commissioners in this proceeding. While such factors do bear weight where, as here, the charges against an attorney do not import criminality or moral turpitude, at the same time they do not relieve this court of its obligation to take proper disciplinary action if the charges of improper and unprofessional conduct are found to be true. (*In re Harris,* 383 Ill. 336.) We are aware, too, that respondent has had no dealings with Vogele or Skidmore for a number of years, and that he apparently terminated the relationship with these men of his own accord. Once again, however, the mere cessation of improper practices does not serve to completely exonerate an attorney for his past misdeeds, nor to forestall all discipline. Under all of the circumstances it is our opinion that the extreme penalty of disbarment is not warranted; however, upon a careful consideration it is our opinion that respondent should be suspended from the practice of law for one year.

*Respondent suspended.*