(No. 37848.—

*In re* WILLIAM J. ROYAL, Attorney, Respondent.

*Opinion filed November 26, 1963.*

J. R. CHRISTIANSON, of Chicago, *amicus curiae.*

JOHN R. FIELDING, of Chicago, for respondent.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

The Committee on Grievances of the Chicago Bar Association, acting as commissioners of this court under Rule 59, have filed a report recommending that respondent, William J. Royal, be suspended from the practice of law in this State for the period of one year. The committee found that on two occasions the respondent had converted the funds of clients to his own use. Respondent, who was admitted to the practice of law in 1951, has filed exceptions to the commissioners' report.

A 5-count complaint was filed against the respondent on February 19, 1962. Count I charged in effect that the respondent converted to his own use funds in the amount of $25,528.75 paid to him by the purchaser of certain property

in Westmont, Illinois. In the transaction, respondent represented the seller of the property. The only testimony offered by the complainant in support of this count was the testimony of the respondent called as an adverse witness under section 60 of the Civil Practice Act. The respondent was examined at length and over his objection. At the conclusion of such testimony, the commissioners found that the allegations were not proved by clear and convincing evidence and this count was dismissed.

The respondent contends that, although it has been held that section 60 of the Civil Practice Act is applicable to disbarment proceedings (*In re Eaton*, 14 Ill.2d 338) it was improper for him to be examined adversely under that section in the absence of some prior showing of a *prima facie* case against him. Count I of the complaint was dismissed and the respondent is actually in no position to raise this question. However, because all of the facts in cases of this nature are often known only to the attorney, this question apparently does come up frequently and the *amicus curiae* has requested that we comment upon it.

We have held that the ultimate responsibility for disciplining attorneys as officers of the court rests on this court and that technical objections as to practice and procedures before its commissioners will not be allowed. (*In re Sanitary District Attorneys*, 351 Ill. 206.) In the foregoing case we stated that "An information in a case such as this is a direct call upon an attorney by the court that he speak. The choice of silence is not open to him if he is to remain an officer of the court." (351 Ill. at p. 256.) An attorney whose conduct has been questioned must, therefore, appear for examination under oath, and must submit for examination whatever records are in his possession relevant to the inquiry. If, from his testimony alone, his conduct clearly requires discipline, there is no question but that discipline should be imposed. See, *In the Matter of Cohen*, 195 N.Y.S.2d 990, 9 App. Div. 2d 436; and, as to the opera-

tion of section 60 in other civil cases, *Kapraun* v. *Kapraun*, 12 Ill.2d 348.

Count II of the complaint concerned the relationship of the respondent with his client, Jasper A. Malito, in the settlement of a claim for personal injuries and the disposition of the funds received in the settlement. The complaint charged that the respondent converted to his own use the sum of $1,476 received from such settlement.

Jasper Malito retained the respondent to represent him in a claim for personal injuries sometime in January of 1960. This claim was settled on November 24, 1960. A draft for $2200 was issued by the insurance company payable to Jasper Malito and the respondent on November 28, 1960. Sometime in November respondent obtained from Malito a power of attorney authorizing him to sign releases, drafts and other papers pertaining to the settlement of the claim. Pursuant to the power of attorney, the respondent endorsed the $2200 check, cashed it, and retained all of the proceeds. It is admitted that, at the time of the receipt and the cashing of the check, respondent did not notify Malito of the settlement and collection of the proceeds thereof.

Malito and the respondent disagree as to what happened during the next few months. Malito states that after signing the power of attorney he called the respondent in December, January, February, March, and April, and each time was told his case was still pending. He also testified that in April he telephoned the insurance company and was told that his case had been settled and a check issued on November 28, that he then telephoned the respondent, informing him of this fact and advising him that he planned to make a complaint to the Chicago Bar Association. He further testified that the respondent then said he would pay the money due in May of 1961, some six months after its receipt. At that time respondent paid Malito $300 and gave him a post-dated check for $962.50, after deducting fees, expenses and doctor bills. The check when presented was dishonored due

to a lack of funds in respondent's trust account. In the second week of June it was replaced by a check on respondent's personal account which was honored by respondent's bank.

Respondent testified he talked to Malito only once or twice from November to May and did not advise him his case was settled until February or March when he also told him he would arrange for a settlement sometime in March, and that settlement was finally made in accordance with Malito's testimony.

The respondent seeks to explain the delay by testifying he was attempting to secure a reduction in the doctor's bill; that he had been mixed up for several months due to certain illnesses in his family. He seeks to refute the claim of conversion by stating that he didn't remember what he did with the proceeds of the $2200; that most of it was in currency money orders which he either carried with him or kept at home in a drawer.

The respondent admitted however that "it would have been a simple thing for me to have endorsed one of the currency money orders to Mr. Malito and ended the obligation due him." He stated that he didn't know why he didn't do that except that Malito indicated he would wait for 30 days and respondent knew his accounts were not in good shape. He further stated that "I am not trying to give the impression that I had sufficient funds in the form of cashier's checks or money orders that I did not deposit, and that I permitted checks to be dishonored on my account. I did have currency money orders at some time."

No evidence of the purchase of currency exchange checks or money orders, except respondent's oral testimony, appears in the record. The above quoted testimony establishes it is unlikely any such checks existed, and that in fact the funds obtained from the settlement were converted by the respondent to his own use.

Count III of the complaint charges respondent with conversion of certain funds received by him from the sale of

real estate owned by eleven separate members of the Malito family. The net proceeds of sale were $19,581.93, of which one half was paid over to Michael Malito and his wife, the parents of the other owners of the property. The balance of proceeds was to be distributed by respondent to ten children, making each share approximate $979. Title to the property had been held in trust and the respondent prepared release agreements for signature by each beneficiary. The real-estate sale was consummated February 28, 1961. The agreements were forwarded to the beneficiaries in March, 1961. Subsequently, in May, 1961, checks in payment were issued by respondent from his "special account" to each of the ten beneficiaries. Three of the checks so issued were returned for insufficient funds. In June, 1961, respondent paid one of the beneficiaries by cashier's check the sum due such beneficiary. In June, 1961, respondent made good the check of another of such beneficiaries from his personal account, and the last beneficiary whose check had been dishonored was paid in July, 1961, in the form of a cashier's check.

The period of time involved in respondent's handling of this transaction corresponded with the period of time involved in count II and covered the period when respondent claimed that he was away from his office for personal reasons involving illness in his family and was not paying attention to the day-to-day transactions of his office and the solvency of his respective banking deposits.

Counts IV and V charge respondent with conversion of funds by reason of his failure to pay a certain Dr. Woodhouse sums due Dr. Woodhouse for treatment, examination, and reports given clients of respondent in connection with personal injury matters in workmen's compensation claims. The commissioners found insufficient evidence and both counts were dismissed.

The commissioners considered and decided on counts II and III of the complaint that evidence of conversion by the

respondent had been proved with regard to his handling of the proceeds of settlement of the Jasper Malito claim for personal injury, and also in his handling of the distribution of the proceeds of sale of the Malito real estate.

These findings were in our opinion fully supported by the evidence and, in fact, except for the finding that Jasper Malito telephoned a number of times from December to April and was told his case was pending, are not seriously disputed by respondent. The commissioners heard the testimony of the witnesses, observed their conduct, and reached this finding on the basis of the conflicting testimony of respondent and Jasper Malito. That finding in our opinion was fully supported by the evidence.

Respondent's principal contention here is that, in view of the mitigating circumstances involving family illness and the fact that full restitution was made, the penalty recommended, suspension from practice of law for one year, was too severe.

We have held that, in the absence of mitigating circumstances, the conversion of one's client's funds is inexcusable and requires that the attorney be disbarred. "Other offenses might be excused, but conversion to his own use of the property of his client is an offense that cannot in any degree be countenanced." *People ex rel. Black* v. *Smith,* 290 Ill. 241, 251.

Again in *People ex rel. Chicago Bar Ass'n* v. *Kwasigroch,* 296 Ill. 542, 548, it is said "An attorney occupies a fiduciary relation to his client, * * *. If he receives money belonging to a client and there is no obstacle to its immediate payment, the only course consistent with his office is to pay it over immediately, and if there is any obstacle to immediate payment, to regard it as a trust fund and not appropriate it to his own use. If an attorney converts to his own use money belonging to a client he demonstrates his unfitness for his office as an attorney, * * *."

On the other hand in the case of *In re Hallmann,* 384 Ill.

325, 333, it was said that "In view of our previous decisions and the mitigating facts pointed out above, we think the commissioners were justified in their recommendation that the respondent be suspended rather than disbarred."

It is true that in the case at bar there are some items of mitigation stated in respondent's brief and in the commissioners' findings. The respondent points out his personal problems and difficulties, particularly as related to the birth of his sixth child and the illness of his wife. The commissioners were not unmindful of these facts and obviously took same into account in recommending suspension rather than disbarment.

On the basis of the adjudicated cases, and the facts in this case, the commissioners having carefully weighed the question of the discipline to be recommended and having fairly determined that this should be suspension of the respondent for a period of one year, their recommendation is not in our opinion unduly harsh and it is, therefore, adopted by this court.

*Respondent suspended.*