(No. 40492.—

*In re* JOHN W. DAMISCH, Attorney, Respondent.

*Opinion filed September 29, 1967.*

J. R. CHRISTIANSON, of Chicago, *amicus curiae.*

HARRY G. FINS and WILLIAM J. SCOTT, both of Chicago, for respondent.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

The Board of Managers and Committee on Grievances of the Chicago Bar Association, as commissioners of this court under Rule 59 (now Sup. Ct. Rule 751), filed a report

recommending that respondent John W. Damisch be suspended from the practice of law for a period of one year. Respondent has objected to this recommendation on various grounds.

Respondent was admitted to the bar of this State in 1950 and has since practiced law in Cook County. The complaint charges that respondent has been guilty of unethical conduct and practices in violation of the Canons of Professional Ethics and the public policy of this State in that pursuant to a scheme to breed litigation by the solicitation of persons having personal injury claims, respondent employed David E. Vogele and Paul Skidmore who solicited in excess of 125 clients for him in connection with which he made in excess of 120 payments to Vogele and at least 5 payments to Skidmore. In addition to denying all the material allegations of the complaint, respondent alleges, in his amended answer, that the constitutional guarantees of equal protection are violated by the practice of the Grievance Committee in restricting its prosecutions for solicitation to individual practitioners while exempting large law firms; that the Canon of Ethics which prohibits the solicitation of legal business is invalid; that disciplinary proceedings are now criminal proceedings and that the instant complaint is barred by the Statute of Limitations; that the amended report found respondent guilty of an offense not charged; that perjured testimony was used by the prosecution; and that respondent was denied access to prior written statements of prosecution witnesses as well as the complaint and report in a prior case involving a member of a large law firm.

Complainant's evidence consists principally of the testimony of the respondent under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1965, chap. 110, par. 60), cancelled checks representing respondent's payments to Vogele and Skidmore, and detailed testimony concerning four of the cases in which solicitation is alleged to have occurred. Respondent's evidence included his own denials of solicitation

and his testimony that he employed Vogele as an investigator, the testimony of other attorneys who said Vogele acted as an investigator for them in some cases under somewhat similar circumstances, and numerous character witnesses.

Since the Committee on Grievances made no findings as to solicitation by Skidmore, we confine ourselves to the evidence in relation to Vogele. Respondent became acquainted with Vogele in 1954 when the latter apparently unsuccessfully engaged in the construction business. From about the middle of the following year until March, 1959, respondent paid him over $19,000. Checks representing this amount were introduced in evidence. Except for some checks relating to matters which he handled for Vogele, his company or his family, respondent testified they were all payments for investigative services which Vogele provided him. He said that there was no written contract in connection with his employment of Vogele and that, while there was no specific agreement as to an hourly rate for the work, compensation was paid on the basis of the time or effort involved in each case. In the overwhelming majority of the cases in which Vogele was involved, he did not furnish a written report, and he never submitted a bill. Respondent absorbed the cost of all of Vogele's "investigations", taking them as deductions on his income tax returns. In contrast to this, in those cases in which other investigators were employed (except where Skidmore did "investigating"), a written report was always filed, written bills were rendered, and the client was charged the cost of the investigation.

Payments to investigators other than Vogele were generally not in equal dollar amounts; the opposite is true as to the checks to Vogele, and those to Vogele were generally greater in amounts than those to other investigators. Some of the checks to Vogele which were unequal in amount were explained by respondent as being payments in cases in connection with which Vogele bore some extraordinary expense for which respondent agreed to reimburse him one-

third or two-thirds, as Vogele normally paid all of his own expenses. Although some of the checks contained a notation of the name of a previous client, respondent could not relate the majority of them to any specific case. Files in cases closed prior to the formation of the partnership in 1960 had been destroyed, but the checks to Vogele had been delivered earlier to the Internal Revenue Service which was investigating him.

One of the cases (Strobehn) concerning which detailed testimony was adduced was not mentioned in the findings of the Commission and will not be considered here. The second involved Eunice Morgan (now Eunice Reid), who was then a minor, and her mother, Mary Morgan, who brought suit for Eunice. Eunice was injured in an automobile accident in 1956, and taken to the Cook County Hospital. Although she was there told that nothing was wrong with her, she was unable to walk. While her mother and she were waiting in the lobby of the hospital for a cab, David Vogele appeared. After he was told what had occurred, he urged Mrs. Morgan to take her daughter to another hospital. He then carried Eunice to his car, drove her to the second hospital, and carried her inside. At this hospital, it was discovered that Eunice had a fractured pelvis, and she remained there for treatment. Mrs. Morgan testified Vogele took her to respondent's office. This was denied by respondent who stated she came alone. A few days later she signed a contract in which she agreed that respondent would represent Eunice in her injury claim in return for a one-fourth contingent fee.

Both mother and daughter testified that they did not know Vogele or Damisch prior to the accident. However, in a discovery deposition which she gave in connection with her daughter's injury case, Mrs. Morgan said: "On the way out [of Cook County Hospital] I met a friend and I told him about the accident. * * * His name was Dave. I don't know his last name." When asked whether she knew

him prior to the accident, she replied: "Sure, sure." Confronted with this inconsistency, she restated her present testimony. Asked why she referred to Vogele as a friend when she had never met him before, she said: "I meant that anyone, I didn't have to know him then, would be a friend if he was doing me a favor by taking my daughter to the hospital. Actually I didn't know Dave before."

On direct examination at the hearing, Mary Morgan stated that she gave a statement in connection with the investigation of respondent. His request for her statement was denied.

William Henry Brown was respondent's client in the third case concerning which there was extensive testimony. In 1957 Brown, a radio mechanic for Chicago Communications Service Company, had an automobile accident. After losing some time from his job, he returned to work still suffering from a stiff neck. David Vogele had brought his car into the service company to have some work done on its radio, and Brown was assigned to work on Vogele's radio. Either Vogele heard about Brown's accident from an outside source or Brown told him about it while working on his radio, but while Brown was so working, Vogele asked him if he needed an attorney. Upon receiving an affirmative response, Vogele went out to his car and got a pad of forms, brought it inside, and had Brown sign one, saying it was for an attorney friend of his. Vogele suggested Brown secure a letter from his employer stating that he had missed several days work and then took some pictures of Brown's damaged car. Either the same day or the next day, Damisch left a message at Chicago Communications for Brown to come into his office. When Brown did so, he saw the form he had signed for Vogele on Damisch's desk. At that time Damisch had him sign another form. Brown did not think he knew Vogele prior to his accident, although he could have worked on Vogele's radio before then. Damisch testified he had no recollection of this case.

Richard D. Klatzco, who talked to Brown for an attorney who represented Damisch in the present proceeding, testified that Brown told him that Erik Casey, Brown's supervisor at the time of the accident, recommended Damisch to Brown. This testimony was corroborated by Larry Peifer, who accompanied Klatzco when he interviewed Brown. Brown denied making this statement and also denied that Casey recommended Damisch. Casey made a similar denial and stated that he did not recommend Damisch and that Damisch had never represented him in any legal matter.

The fourth case involved George Wright who was also involved in an automobile accident in 1957. Following this accident, a man visited Wright's home. Wright said the man had him sign an agreement calling for a 30% contingent fee and then gave him Damisch's card, telling him to call Damisch within a week. Wright first identified this man as Vogele, but he later changed this testimony saying that it was Richard Leuckhardt who had visited him and that he had made an honest mistake when he first testified. This later testimony also disclosed that a representative of The Chicago Bar Association had visited Wright during the investigation of Damisch and that it was only after he had shown Wright a picture of Vogele and told Wright Vogele's name that Wright identified Vogele as the man who had contacted him. Wright said that, after he first testified, Leuckhardt visited him, and he then recognized Leuckhardt as the contact man. Leuckhardt and Wright's wife corroborated Wright's corrected testimony. Leuckhardt further testified that he was a long-time client of Damisch's, had referred several cases to him, and contacted Wright upon the request of a fellow employee who told him that Wright had been in an accident and was being given a rough time by the other party involved in it. He said he did not know if he had Wright sign anything.

Four attorneys testified that they had employed Vogele as an investigator. The first testified that he thought he re-

ceived written reports in the majority of cases that Vogele investigated for him. He described the method used to determine Vogele's compensation, and this was quite similar to that which respondent testified he and Vogele used. He further testified that he terminated Vogele's employment when he heard what an unsavory character he was. The second said that Vogele furnished written reports in some of the cases he investigated for him and that he thought he paid Vogele in accordance with a memorandum which recited time and expenses incurred on each case. He said that Vogele may have referred some personal injury cases to him and that he did not pay Vogele for these references. The third said Vogele investigated only three cases for him, each of which Vogele referred to his office, and that Vogele was not very efficient. The fourth said he paid Vogele on the basis of time spent and that in most cases he thought Vogele furnished him with a record of this. He said that Vogele might have referred one or two cases to his office and that he believed that Vogele furnished him with written reports of his investigations.

The amended report of the Grievance Committee, as approved by the Board of Managers, found that respondent's denials that he employed Vogele as a solicitor in any of these cases were false. This finding was based upon the total amounts of money paid Vogele, the absence of written reports or bills, the unsatisfactory nature of respondent's explanation of the basis of Vogele's charges, respondent's practice of not charging clients for the payments to Vogele, but charging them for payments to other investigators, and the fact that payments to Vogele were higher than those to other investigators used by respondent.

Since the complaint contained no references to Leuckhardt, and since Vogele clearly had no connection with the Wright case, respondent's objection to consideration thereof is well taken, and we have eliminated this testimony from consideration. See *In re Thompson,* 30 Ill.2d 560, 566.

The majority of respondent's arguments do not require extensive consideration. Such is the case with the contention that the investigator for the Committee on Inquiry committed the criminal offense of subornation of perjury in connection with the testimony of George Wright. There is nothing implausible about Wright's explanation that he made an "honest mistake" when he first identified the man who had visited him as Vogele, but later decided that it was Leuckhardt, and the fact that Richard Yocom showed him a picture of Vogele and suggested the name to him is scarcely evidence of subornation of perjury. Moreover, there is no allegation that respondent was prejudiced in any way by the original testimony of George Wright, and clearly no such allegation is possible, since he later corrected this testimony. This case is in no way comparable to *In re Heirich,* 10 Ill.2d 357, cited by respondent.

Respondent also complains of violations of established rules of evidence and procedure. He especially takes issue with the Commissioners' refusal to order production of the statement given by Mary Morgan in connection with the investigation of respondent. While not arguing that he was injured by any one of these alleged errors, except that in connection with the Morgan statement, he contends that their sum total constituted denial of a fair hearing. He alleges that production of Mrs. Morgan's statement would have further demonstrated the falsity of her testimony. We have often said that legal technicalities may not be invoked as a defense to a charge of unprofessional conduct (*E.g., In re Royal,* 29 Ill.2d 458, 460; *In re Yablunky,* 407 Ill. 111, 120), and, in the absence of a showing that prejudice resulted from the rulings on evidentiary questions, such rulings will not effect the validity of a disciplinary hearing. Mary Morgan's statement was submitted to this court, and there is nothing in it which bears on the question whether she knew David Vogele before he approached her in the Cook County Hospital. While it may be that the

Commissioners should have ordered production of this statement, no prejudice resulted from its refusal to do so. Our examination of the record herein convinces us that respondent was not denied a fair hearing.

During the course of the proceedings, respondent filed a motion asking the Commissioners to remove Lawrence J. West as counsel for complainant. In it he alleged that, "after the hearing on December 3, 1964 * * * in the presence of John B. Lampe and John W. Damisch, Lawrence West threatened Harry G. Fins [one of the attorneys who represented respondent] in vulgar and obscene language with physical violence if * * * Fins would continue to defend [respondent] * * * The threats * * * were intended to intimidate * * * Fins from representing [respondent] * * * and to stifle the defense of [respondent] * * * thereby interfering with the processes of the Supreme Court of Illinois." Respondent also asserted that this action constituted a denial of due process. Affidavits were submitted in support of this motion which was denied. Arguing that the failure of West to submit counteraffidavits constituted an admission of the factual matters asserted in the motion and affidavit, respondent now repeats the conclusions of the motion and further asserts that the Commissioners had not only the power, but the duty, to remove West and that West committed the criminal offense of intimidation. Without indicating our opinion on the question of whether the Commissioners had the power or the duty to remove counsel for complainant, it is sufficient to state that Fins was not intimidated by any threats made by West, as he is still vigorously representing respondent, and that there is no allegation that respondent was prejudiced in any way by the alleged threats. Respondent's conclusions are without merit.

Nor do we find any greater significance in the argument that respondent has been denied equal protection of the laws because the Commissioners allegedly do not enforce

against large law firms the Canon of Ethics which prohibits the solicitation of legal business (Canon 28), but only prosecute violations by individual practitioners. As support for this claim, respondent points to one case in which the Commissioners censured a large law firm member but did not recommend presentation to this court, although he asserts that there was a gross violation of the Canon. As noted by *amicus,* the fact that a particular case was treated differently by the Commissioners from respondent's case is simply not relevant here. Each case depends on its own facts (*In re Sullivan,* 33 Ill.2d 548, 554; *In re Smith,* 365 Ill. 11, 16-17), and identical treatment is not required, since the conditions and circumstances under which categorical misconduct may occur vary widely. Assuming that a pattern of discrimination in favor of large law firms would be significant in considering respondent's culpability, such pattern is certainly not established by this evidence relating only to a single case in which the circumstances were totally inapposite to those here.

Respondent further argues that, under *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U.S. 1, 12 L. Ed. 2d 89, the first and fourteenth amendments to the Federal constitution preclude the States from interfering with the right of labor unions to recommend specific attorneys to their members, and that a necessary result of this holding is that Canon 28 cannot be enforced in such instances; consequently, respondent maintains, enforcement of the Canon against any other class of attorneys constitutes a denial of equal protection. The fallacy of this argument lies in the assertion that Canon 28 no longer has any validity in cases involving attorneys recommended by unions to union members. In the *Brotherhood* case, the court pointed out that neither the railroad workers nor the lawyers there involved had been guilty of any solicitation. Thus, while this decision might increase the difficulty of proving that an attorney who has been suggested by a union has

violated Canon 28, it does not preclude the imposition of discipline whenever such a violation is shown.

Respondent also urges that *Spevack* v. *Klein,* 385 U.S. 511, 17 L. Ed. 2d 574, 87 Sup. Ct. 625, has made it clear that disciplinary proceedings are criminal in nature, entitling respondents therein to all the rights to which criminal defendants are entitled, and that its implications are fatal to complainant's case. *Spevack* extends the privilege against self-incrimination to an attorney in a disciplinary proceeding. The reason given for this extension is that disbarment is a punishment and that there can be no punishment for refusal to speak. The fifth amendment provides that: "No person * * * shall be compelled *in any criminal case* to be a witness against himself." (Emphasis supplied.) Seizing on the italicized language of this quotation, respondent apparently argues that since the Supreme Court extended the privilege against self-incrimination to an attorney in a disciplinary proceeding, such a proceeding must be a "criminal case". In his reply brief he recognizes that the italicized language has been wholly ignored in defining the limits of the privilege against self-incrimination and by so doing he has acknowledged the defect in his argument. Nothing in *Spevack* has affected the continuing validity of the rule which has heretofore been adhered to in this State: a disciplinary proceeding is not a criminal prosecution and is not subject to all the rules that govern such a case. *E.g., In re Anderson,* 370 Ill. 515, 522; *In re Needham,* 364 Ill. 65, 68.

The principal argument presented is that the evidence in support of the complaint is insufficient to establish solicitation, citing our decisions holding the complaint of misconduct similar to an indictment in that respondent is presumed innocent until proved guilty (*In re Donaghy,* 393 Ill. 621) and that the evidence should be resolved upon a theory of innocence where reasonably possible to do so (*People* v. *Bentley,* 357 Ill. 82). There is no doubt that

such is and should be the rule, but neither the Commissioners nor this court are required to be naive or impractical in appraising an attorney's conduct (*In re Krasner,* 32 Ill.2d 121). While, of the four cases in which detailed testimony was offered by the Committee on Inquiry, two (Strobehn and Wright) have been eliminated from consideration and the evidence in the other two (Morgan and Brown) is scarcely conclusive, it requires greater credulity than we or the Commissioners possess to accept at face value respondent's claim that Vogele's activities on his behalf were limited to investigations; nor do we believe that in many cases respondent was unaware that his payments to Vogele represented more than the customary cost of such meagre investigative results as respondent was able to recall. It is simply incredible that some $19,000 would have been paid to Vogele for investigations under circumstances as nebulous and unsupported by tangible evidence as those related by respondent. We believe the evidence as a whole supports the charges to the extent that disciplinary action is required. "[W]hile neither the solicitation of law business nor the division of fees here involved imports venality, fraudulent practices or moral turpitude, they are nevertheless practices which have long been condemned as a blight upon the legal profession." *Krasner,* p. 129.

We come then to a consideration of the discipline to be imposed—the only real issue in this case—but one never easily resolved. The Committee on Grievances recommended a three-year suspension from practice; this was reduced by the Board of Managers to one year. The undisputed evidence established that respondent has practiced law since 1950 with no complaint as to his conduct other than that with which we are here concerned. Respondent's relationship with Vogele terminated more than 8 years ago, and no other questionable conduct is alleged since then. No client has complained of his conduct. Respondent has been married 13 years, has two children aged 9 and 12 and provides

a home for his 75-year-old father-in-law. He has been active in Boy Scout, Parent-Teacher, United Fund and other civic organization work. He has held or holds positions of leadership in the Presbyterian Church. His wife testified he was a good husband, father and provider. He has held governmental offices, including those of justice of the peace and assistant to the State Treasurer. Numerous Federal and State judges, both trial and appellate, as well as a number of practicing lawyers and businessmen, testified to respondent's good character and reputation. Aside from his unacceptable explanation of his dealings with Vogele, respondent was generally co-operative with the Commissioners, and we believe this a factor of some significance in determining the punishment to be imposed.

The case most nearly analogous to this is *Krasner*. Krasner was also involved with Vogele and Skidmore, but Krasner specifically denied employing Vogele as an investigator. Instead he claimed the payments made by him were merely "gratuities" in acknowledgement of his appreciation for Vogele's actions in referring cases to him. The Commissioners recommended Krasner's suspension for 5 years. This court determined he should be suspended for one. There are other features distinguishing the two cases. The record establishes that respondent did represent Vogele, his firm and his family, at least as to part of their legal work in the early stages of their acquaintanceship, and a few of the checks may be attributable to distributions of amounts collected for them; the number of cases referred by Vogele is uncertain, for respondent testified that some of the checks payable to Vogele were given in cases in which the client came to respondent as a result of recommendations from other clients or friends; it is not disputed that Vogele did do some work of an investigative nature, although considerable question exists as to whether this occurred in any substantial number of instances.

We have carefully considered the entire record in the

light of our obligation to maintain the standards of the legal profession so that public confidence therein may continue to be warranted, while at the same time observing considerations of fundamental justice to the individual respondent. (*In re Sullivan,* 33 Ill.2d 548, 556.) We conclude that the appropriate disciplinary measure in this instance is censure, and it is so ordered.

*Respondent censured.*