(No. 49022.—

*In re* LOUIS M. MARCH, Attorney, Respondent.

*Opinion filed April 3, 1978.—Rehearing denied May 26, 1978.*

CLARK, J. dissenting.

John C. O'Malley, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Louis M. March, of Chicago, *pro se*.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Pursuant to the directions from the Inquiry Board of the Attorney Registration and Disciplinary Commission, the Administrator of the Commission filed a 9-count complaint charging unprofessional conduct on the part of the respondent, Louis M. March, who was licensed to practice law in this State in 1937 and maintains an office in Chicago. At the conclusion of hearings on the complaint the Hearing Board found that counts I, II and VIII had not been proved by clear and convincing evidence and that only a part of the misconduct alleged

in count III had been established. The proof offered in support of counts IV, V, VI, VII and IX, however, was found to establish unprofessional and unethical conduct by respondent tending to bring the legal profession into disrepute. Suspension from practice for 3 years was recommended as to each of counts III, IV, V, VII and IX and disbarment as to count VI. It was also recommended that as counts III, IV, V, VI and VII "collectively show a continuing standard of conduct on the part of respondent, we conclude that he is unfit to practice law and respondent should be disbarred."

Respondent filed with the Review Board his exceptions to the findings and conclusions of the Hearing Board. Those findings and conclusions were affirmed by the Review Board, which has filed with this court its report recommending respondent's disbarment. The case is before us on respondent's exceptions to that report and oral argument by the parties.

It is alleged in count III that, in addition to representing her in several legal actions, respondent represented to Leocadia Borkowski that he was a financial advisor and an expert in the stock market; that as a result of such representations Mrs. Borkowski entrusted respondent with funds to invest on her behalf which respondent failed to do and for which he has failed to give Mrs. Borkowski an accounting; that his conduct constituted misrepresentation, fraud, deceit, dishonesty, gross overreaching, abuse of the attorney-client privilege and conversion of funds. The Hearing Board concluded that it had not been proved by clear and convincing evidence that respondent's conduct involved misrepresentation, fraud, deceit or dishonesty or that respondent had converted funds to his own use. It did find, however, that respondent's conduct with respect to the investing of Leocadia Borkowski's funds constituted a gross overreaching and an abuse of the attorney-client

relationship violating two provisions of the Code of Professional Responsibility. Illinois Code of Professional Responsibility, as approved by the Illinois State Bar Association (rev. 1977), Disciplinary Rule 5—104(A) (conflict of interest) and Disciplinary Rule 9—102(B) (failure to account).

At the outset of the hearing before the Hearing Board, respondent moved to dismiss the complaint against him, citing the fifth and fourteenth amendments to the Federal Constitution and section 10 of article I of the Illinois Constitution. When that motion was denied the Administrator sought to call respondent as an adverse witness for cross-examination under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60). Respondent objected, again asserting the constitutional protections against self-incrimination. The chairman of the hearing panel indicated the panel's view that the fifth amendment and the corresponding provisions of the Illinois Constitution protected respondent from testifying to incriminating facts but were not a basis for dismissing the complaint. After respondent indicated his intention to refuse, on these grounds, to answer any questions relating to any of the complainants, respondent was excused.

Thereafter, proof was introduced through a number of building and loan, bank and brokerage firm employees or officers called to identify various cashier's checks, drafts and stock certificates representing funds apparently given by Mrs. Borkowski to respondent to invest for her. A stockbroker with whom respondent dealt at the brokerage house of Paine, Webber, Jackson and Curtis, Inc., testified he first met respondent when the latter walked in one afternoon, started talking about the stock market, and proposed that the witness let respondent handle the witness' personal account, the respondent to receive a percentage of any profits he made for the

witness. There are in evidence forms signed by Leocadia Borkowski authorizing respondent to buy and sell securities on her behalf, and it is clear that he did so in substantial amounts. Respondent decided what stocks to buy and when to do so. Those he purchased were highly speculative, a fact which disturbed the Paine, Webber firm, which was aware that Mrs. Borkowski was a widow. The firm both wrote and called her, informing her of the speculative nature of the stocks in her account. She indicated she understood this, wished to purchase them, and desired respondent to handle her account. By 1973 her relationship with him had deteriorated to the point where she filed a written complaint with the Commission, indicating she was without funds and unable to secure an accounting from respondent. In mid-1975 she notified the Commission that she wished to withdraw her complaint against respondent, and she refused, on fifth amendment grounds, to testify in the disciplinary proceedings.

Despite the rather substantial volume of testimonial and documentary evidence relating to the Borkowski matter, we do not believe that any portion of the misconduct alleged in count III can be said to have been proved by clear and convincing evidence.

Counts IV and V concern respondent's dealings as a "financial advisor" to Irving Gold, an assistant director of the municipal division of the circuit court of Cook County. That complaint did not involve an attorney-client relationship. Gold was, however, aware that respondent March was an attorney when they happened to meet on several occasions at a cafeteria in the Richard J. Daley Center. During such chance meetings, the discussion often centered upon the stock market, with March indicating to Gold that he was an expert in the market.

On June 10, 1968, after several such meetings, Gold and March entered into a written agreement whereby, in

consideration of his experience in the buying and selling of stocks, March was to "select stocks for purchase and sale by Irving Gold in his account for a period of three years." In exchange, March was to receive 15% of any gains resulting from such purchases and would not be liable for any losses or expenses. All expenses of March were to be taken into account when an accounting was made between the parties. March was given the "sole discretion to determine when the stock \*\*\* shall be sold during said term, and accounting to be made after each sale of stock." Based upon March's representations as to the company's potential, the agreement also provided that March's first transaction would be to buy approximately 1,000 shares of common stock in Western Land Corporation in Gold's name for a purchase price of $2,500.

During subsequent encounters throughout 1968-70, March continued to assure Gold that the stock was increasing in value and represented the price to be from $2 to $5 per share. The market value did, in fact, range from $1 to $1.50 during this period. Accompanying such false assurances, March continued to solicit funds for the purchase of Western Land stock, and on two separate occasions Gold forwarded March $2,500 and $750 respectively to purchase additional Western Land stock. The $750 transaction was concluded by a written agreement, dated January 2, 1969, by which 30% of those shares purchased for Gold were assigned to March and which entitled March to 30% of the profits derived from this stock. March failed to disclose to Gold that March's wife owned stock in Western Land, even though part of the stock purchased by March for Gold at $2.50 per share was purchased from respondent's wife when the market value was substantially below that level.

In 1971, as the term of the original March-Gold agreement ended, Gold made several unsuccessful efforts

to contact March in order to obtain an accounting. On May 20, 1971, Gold sent a letter to March requesting an accounting under their agreement. March denies receiving this letter. In September 1971 Gold finally met with March, at which time Gold was informed by March that the Western Land stock was worth $.50 per share. In early 1972, Gold hired another attorney, who sued March for an accounting and rescission of their original agreement. In settling that case, March agreed to repay Gold over $3,000. Gold testified he felt this was the best settlement he could receive, although he suffered a substantial loss and was forced to pay his attorney fees.

We recognize that respondent was not acting in his professional capacity with respect to his dealings with Gold. However, we agree with the hearing panel and Review Board that March may be subject to discipline for conduct outside his professional capacity. "[I]t is not necessary that his acts be strictly in the discharge of professional duties. Any act which evidences want of professional or personal honesty, such as renders him unworthy of public confidence affords sufficient grounds for disbarment." *In re Melin* (1951), 410 Ill. 332, 337; see also *In re Sanitary District Attorneys* (1932), 351 Ill. 206, 237.

We believe the sale of respondent's wife's stock to Gold at a price substantially above its then market value, together with his misrepresentation of the value of the Western Land Corporation stock, supports the conclusion of the hearing panel and Review Board that March's conduct with respect to Irving Gold "constitutes fraud, deceit and misrepresentation, the representation of conflicting interests to his own advantage and is conduct which is unprofessional and unethical and which tends to bring the legal profession into disrepute." Illinois Code of Professional Responsibility, as approved by the Illinois State Bar Association (rev. 1977), Canon 1, Disciplinary

Rule 1—102(A)(4).

Counts VI and VII concern alleged unethical and unprofessional conduct based upon respondent March's attorney-client relationship with Creston and Freida McIntyre. The McIntyres consulted respondent concerning a medical malpractice claim stemming from the alleged negligence of a doctor in examining and treating Freida McIntyre on February 16, 1968. Respondent was retained by the McIntyres on July 21, 1969, on a 50% contingency basis and was paid a $1,000 retainer.

After approximately 9 months elapsed with no apparent action by respondent, the McIntyres took the initiative and consulted him. On April 17, 1970, the McIntyres paid March $1,000 in exchange for a promissory note from March due and payable, with interest, 3 years from that date. Creston McIntyre testified that it was his impression that this amount was to cover the costs of the suit if it was unsuccessful, while March contends it was unrelated to the malpractice claim and was received in response to his general representation to the McIntyres that it was a good investment period. In any event, this note was not paid when due. Additionally, on that same date, the McIntyres paid respondent $500 to cover the costs of employing a doctor to assist them in pursuing their malpractice claim.

On May 22, 1970, 10 months after the McIntyres had retained March and 3 months after the 2-year statute of limitations had expired, suit was filed by March on behalf of the McIntyres against the allegedly negligent doctor. That suit was dismissed because barred by the 2-year statute, and an amended complaint was filed attempting to allege fraudulent concealment by the doctor which would have brought the case under the 5-year statute of limitations. The amended complaint was dismissed for failure to allege facts stating a cause of action under the 5-year statute. An appeal was dismissed

by the appellate court for lack of jurisdiction because notice of appeal had not been timely filed, and this court subsequently denied leave to appeal.

Throughout this period, respondent March assured the McIntyres that their claim was in the appellate court and ultimately this court. Such assurances apparently did not include the fact that the suit had been dismissed and that an appeal was necessary to attempt to vacate that dismissal. Further, in April 1971, March solicited an additional $800 to finish the case.

The McIntyres were ultimately forced to retain other counsel in their attempt to recover the amounts paid to March, including the amount of the promissory note. In September 1972 a suit was filed which resulted in a default judgment against March. March has apparently satisfied this judgment by repaying the $3,300 which he had obtained from the McIntyres. However, this repayment was accomplished only after much effort and expense by the McIntyres. In fact, Creston McIntyre testified that the McIntyres had personally recovered only about one-third of the amount which they had paid to March.

In sum, March's neglect of the legal matter which the McIntyres entrusted to him caused their suit to be dismissed as barred by the statute of limitations. Throughout their relationship, March was, at best, less than honest with his clients as to the status of their case. He did, however, continue to request and receive money from them. The McIntyres were forced to resort to the added effort and significant expense of retaining other counsel and filing of suit simply to obtain any settlement with March.

We agree with the hearing panel and Review Board that March's actions constitute gross neglect of a legal matter entrusted to him, dishonesty and misrepresentation, and abuse of the attorney-client relationship, and is

conduct which is unprofessional and unethical and which tends to bring the legal profession into disrepute. See generally, Illinois Code of Professional Responsibility, as approved by the Illinois State Bar Association (rev. 1977), Canons 1, 2, 6; Disciplinary Rules 1—102(A)(1), 2—101(B), 6—101(A)(3).

Count IX of the complaint against respondent is based upon his refusal to honor a *subpoena duces tecum* issued by the clerk of this court. This subpoena commanded respondent to appear and produce documents before the Administrator in connection with the investigation of the charges against him. Although respondent's motion to quash that subpoena on fifth amendment grounds was denied by this court, he did not produce the requested documents. No further action was taken to enforce the subpoena.

Respondent's argument centers on his contention that the fifth amendment guarantee against self-incrimination applies here to exempt him from any obligation to produce the requested documents or to testify to the matters in question. The applicable provision of the fifth amendment provides that no person "shall be compelled in any *criminal* case to be a witness against himself" (emphasis added). This provision is, of course, made applicable to the States by the fourteenth amendment. (*Malloy v. Hogan* (1964), 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489.) Article I, section 10, of the Illinois Constitution contains substantially the same language.

Prior to the Supreme Court's decision of *Spevack v. Klein* (1967), 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625, discussed later, no question existed regarding an attorney's obligation to testify or produce requested documents in a disciplinary proceeding. "It is axiomatic that an attorney whose conduct is questioned must appear for examination under oath, and must submit for

examination whatever records are in his possession relevant to the inquiry." (*In re Krasner* (1965), 32 Ill. 2d 121, 126.) "The choice of silence is not open to him if he is to remain an officer of the court." (*In re Royal* (1963), 29 Ill. 2d 458, 460 (quoting *In re Sanitary District Attorneys* (1932), 351 Ill. 206, 256).) Wholly apart from the issue of whether respondent was required to testify and produce the documents, however, he was not justified in simply ignoring the subpoena. The subpoena had been properly issued, and attempts to quash it had failed. It was therefore respondent's professional obligation to comply with the court order. *UMW Hospital v. UMW District 50* (1972), 52 Ill. 2d 496; *County of Peoria v. Benedict* (1970), 47 Ill. 2d 166; *Board of Education v. Kankakee Federation of Teachers Local 886* (1970), 46 Ill. 2d 439.

The salient question therefore becomes whether attorney disciplinary proceedings are to be considered criminal in nature. We believe they are not. "The first purpose of a proceeding to discipline a member of the bar is to protect members of the public, to maintain the integrity of the legal profession and to safeguard the administration of justice from reproach." (*In re Nowak* (1976), 62 Ill. 2d 279, 283. See also *In re Leonard* (1976), 64 Ill. 2d 398.) "Punishment is not the object. The object of such an inquiry is to determine whether the attorney is a proper person to be permitted to practice his profession." *In re Andros* (1976), 64 Ill. 2d 419, 423.

We believe this case is controlled by the reasoning of *In re Schwarz* (1972), 51 Ill. 2d 334, *cert. denied* (1972), 409 U.S. 1047, 34 L. Ed. 2d 499, 93 S. Ct. 527. In that case, a disciplinary proceeding was brought based upon testimony which an attorney had given under a grant of immunity at a prior criminal trial. The attorney objected to the use of such testimony at the disciplinary

proceeding as violative of the fifth amendment and contrary to the statutory immunity which he had been granted. In allowing the immunized testimony to be used, this court rejected the attorney's contention based upon its finding that the immunity applied only to criminal prosecutions and not to attorney disciplinary proceedings. "The respondent has not been prosecuted criminally by reason of his testimony, and his fifth amendment rights have not been violated." 51 Ill. 2d 334, 338.

A similar result was recently reached by the United States Court of Appeals for the Seventh Circuit in an analogous case. (*In re Daley* (7th Cir. 1977), 549 F.2d 469, *cert. denied* (1977), 434 U.S. 829, 54 L. Ed. 2d 89, 98 S. Ct. 110.) There, the court discussed the "remedial" rather than criminal nature of Illinois attorney disciplinary proceedings. (549 F.2d 469, 475-77.) Thus, despite a grant of immunity from criminal prosecution which specifically purported to preclude the use of incriminating testimony at subsequent disciplinary proceedings, the court held the introduction of such testimony was not proscribed by the fifth amendment privilege against self-incrimination. 549 F.2d 469, 474-78.

In holding the fifth amendment inapplicable to attorney disciplinary proceedings, we join all of the jurisdictions which have spoken to this issue. Illustratively, the Court of Appeals of New York has recently held in a *per curiam* opinion that testimony compelled before a grand jury under a grant of immunity could be introduced at disciplinary proceedings without violating the Federal or New York constitutions. (*In re Anonymous Attorneys* (1977), 41 N.Y.2d 506, 362 N.E.2d 592, 393 N.Y.S.2d 961.) The court believed this result to be required by the State's interest in regulating the legal profession.

"The State has a compelling interest in regulating our system of justice to assure high standards of professional conduct. Sanctions imposed in that capacity are distinct and apart from penalties and forfeitures stemming from criminal proceedings. Once the constitutional guarantee that no person 'shall be compelled in any criminal case to be a witness against himself' is assured by a grant of immunity, the State may act, and indeed must act, in its supervisory capacity to assure that those standards are maintained." *In re Anonymous Attorneys* (1977), 41 N.Y.2d 506, 511, 362 N.E.2d 592, 597, 393 N.Y.S.2d 961, 965.

The Supreme Court of California similarly has found that neither the fifth amendment nor the equivalent provision of the California Constitution prohibited the introduction during disciplinary proceedings of testimony given under a grant of immunity before a congressional committee or at an earlier trial. (*Segretti v. State Bar* (1976), 15 Cal. 3d 878, 544 P.2d 929, 126 Cal. Rptr. 793.) For a list of other States reaching the same conclusion, see *In re Daley* (7th Cir. 1977), 549 F.2d 469, 476 n.6. See also Annot., 62 A.L.R.3d 1145 (1975).

In asserting his contentions based upon the fifth amendment, respondent places great reliance upon *Spevack v. Klein* (1967), 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625. *Spevack* involved an attorney's refusal to testify or produce documents in connection with a disciplinary inquiry into his alleged misconduct. No grant of immunity from the subsequent use of such testimony or documents in criminal proceedings had been given. A divided Supreme Court held that professional discipline could not be imposed based upon these circumstances. But that holding in no way implies that,

once immunity coextensive with the privilege is granted, the statements may not be used in disciplinary proceedings.

This court has indicated that *Spevack* should not be read so broadly as to hold the privilege against self-incrimination applicable to disbarment proceedings. (*In re Schwarz* (1972), 51 Ill. 2d 334, 338.) Rather, "[a]nswers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying." (*Schwarz* at 338 (quoting *Gardner v. Broderick* (1968), 392 U.S. 273, 276, 20 L. Ed. 2d 1082, 1085, 88 S. Ct. 1913, 1915).) Compelling such testimony at disciplinary hearings does not offend the essential purposes of the privilege, and it serves the beneficial purpose of enabling States to effectively enforce and maintain their standards of professional conduct. *In re Anonymous Attorneys* (1977), 41 N.Y.2d 506, 511, 362 N.E.2d 592, 597, 393 N.Y.S.2d 961, 965.

The immunity required to satisfy the fifth amendment causes no problem in cases where incriminating testimony has been compelled at earlier proceedings. Such immunity from criminal prosecution has generally been provided by Federal or State authorities. There remains, however, the need to establish the existence of a use immunity which can be afforded to the attorney who, like respondent March, asserts his fifth amendment protections for the first time at the disciplinary proceedings. Thus, when the attorney is summoned before the disciplinary panel, there have not yet been guarantees against the use of such testimony at subsequent criminal proceedings sufficient to satisfy the fifth amendment. See *Spevack v. Klein* (1967), 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625.

Analogously, in the context of intramural prison

disciplinary proceedings, the *Spevack* line of cases has been read to hold that the fifth amendment will *imply* a grant of immunity from the use of testimony at subsequent criminal proceedings when a person is faced with a choice between self-incrimination and the relinquishment of a fundamental interest. *Fowler v. Vincent* (S.D.N.Y. 1973), 366 F. Supp. 1224, 1228; see also *Baxter v. Palmigiano* (1976), 425 U.S. 308, 335 n.8, 47 L. Ed. 2d 810, 832 n.8, 96 S. Ct. 1551, 1566 n.8 (Brennan, J., concurring in part & dissenting in part).

A similar imposition of use immunity has been intimated for an attorney's testimony in disciplinary proceedings. (*In re Zuckerman* (1967), 20 N.Y.2d 430, 231 N.E.2d 718, 285 N.Y.S.2d 1, *cert. denied* (1968), 390 U.S. 925, 19 L. Ed. 2d 985, 88 S. Ct. 856.) It seems to us, however, that an attorney is not entitled to be automatically protected from the future use of testimony given by him in a disciplinary proceeding. Rather, that protection should be afforded only where testimony has been given after the assertion by the respondent of a valid fifth amendment privilege and a resulting grant by this court of immunity from the future use of that testimony or its fruits in criminal proceedings. Society is best protected from corrupt lawyers by requiring the few members of our profession who may be so categorized to testify in disciplinary proceedings. If that testimony may, however, incriminate him, *Spevack* entitles the lawyer to refuse. Should the Administrator deem his testimony essential, a grant of immunity from the future use of such testimony in criminal proceedings against the respondent lawyer may be sought from this court upon reasonable notice to the respondent. There may be circumstances in which the possibility of jeopardizing a criminal prosecution by subjecting it to the claim that it was instituted or advanced by the use of information derived from

testimony compelled in a disciplinary proceeding ought not to be risked. Resolution of that issue in a manner which sufficiently implements fifth amendment protections while adequately supervising the legal profession will be this court's responsibility.

We accordingly hold that an attorney in a disciplinary proceeding may be compelled to testify if he is granted immunity by this court from the use of such testimony at subsequent criminal proceedings and is so informed at the disciplinary hearing. Thereafter, a continued refusal to testify may, obviously, result in disciplinary sanctions.

These procedures were not followed in this case. We believe, however, in light of the evidence in this record, it . is unnecessary to remand the cause to afford the Administrator the opportunity to consider petitioning for such immunity in order to compel respondent's testimony.

We come then to a consideration of the discipline to be imposed. In view of our conclusion that the proof was insufficient to support count III and the fact that there is no record of prior disciplinary action against respondent, we conclude that his suspension from the practice of law for a period of 1 year and until the further order of the court is appropriate, and it is so ordered.

*Respondent suspended.*

MR. JUSTICE CLARK, dissenting:

There can be no doubt that the Administrator has produced substantial evidence of serious misconduct by the respondent. However, my review of the record in this case also leaves me with no doubt that the rights of the respondent have been so thoroughly abused in these proceedings that the outcome ought not stand unchallenged. "[T]he imperative of judicial integrity"

(*Elkins v. United States* (1960), 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 1680, 80 S. Ct. 1437, 1447) mandates that we examine with the strictest scrutiny the conduct of those attorneys to whom we have entrusted the day-to-day operations of our disciplinary system. Here again, as in *In re Madsen* (1977), 68 Ill. 2d 472, 489-90 (Dooley & Clark, JJ., dissenting), I find that conduct wanting in several respects.

At the outset, it may be useful to comment generally upon what I perceive to be a disturbing trend in the operation of our disciplinary system. An unusually high number of the disciplinary cases which reach this court apparently involve sole practitioners and individuals with smaller, less prominent practices. I am not persuaded that professional misconduct is similarly concentrated among such attorneys. Rather, I fear that these attorneys are simply more convenient targets of disciplinary proceedings, because they are often forced by economic necessity to proceed *pro se,* as was the respondent in the instant case. The generally lower fees and contingent-fee arrangements provided by the sole practitioners and attorneys in smaller, less prominent law firms are the only means by which the vast majority of people can afford the legal representation to which the profession proclaims the public is entitled. See ABA Code of Professional Responsibility, Canon 2 (1976); Illinois Code of Professional Responsibility, Canon 2 (1977).

While this observation is not intended to imply that such attorneys are entitled to be judged by a lower than normal standard, neither should they be the sole focus of our disciplinary system.

The proceedings in the instant case demonstrate how easy it is for the Administrator to take undue advantage of the imbalance of forces between the Administrator and the respondent (see *In re Madsen* (1977), 68 Ill. 2d 472, 490 (Dooley & Clark, JJ., dissenting)), particularly where, as

here, the respondent is an older attorney, in poor health, and forced to proceed *pro se.*

On August 7, 1975, in connection with counts IV through VII of his complaint, the Administrator demanded that the respondent admit the truth of certain facts and the genuineness of certain documents pursuant to Supreme Court Rule 216 (58 Ill. 2d R. 216). The respondent served timely notice of his objection to that request upon the Administrator. (See 58 Ill. 2d R. 216(c). See also 65 Ill. 2d R. 753(c) (practice before the Hearing Board governed by the practice in civil cases, as modified by rule).) That the objections also were styled in the form of a "motion to quash" is irrelevant, since they gave the Administrator more than adequate notice of their content and purpose, as well as a meaningful opportunity to respond thereto. (*Cf. Parrino v. Landon* (1956), 8 Ill. 2d 468, 470 (adequacy of pleadings), 58 Ill. 2d R. 2(a); Ill. Rev. Stat. 1975, ch. 110, par. 4 (construction of rules).) The proper procedure thus would have been for the Administrator to have requested the Hearing Board to hold a hearing to determine the propriety of the objection. Instead, the Administrator led the Hearing Board to conclude that the respondent should be deemed to have admitted the matters in question. This was in itself an inaccurate statement of the law on the part of the Administrator and grounds for reversal of the decision of the Hearing Board.

The Hearing Board also apparently considered that the respondent's objections to the Administrator's request were, on the merits, insubstantial. This too was error. The respondent claimed that responding to the Administrator's request for admissions might tend to incriminate him, and therefore his privilege against self-incrimination permitted him to refuse to respond to that request. In my opinion, the respondent's position is clearly supported by the decision of the United States Supreme Court in *Spevack v. Klein* (1967), 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct.

625. In *Spevack,* the court unequivocally held that a respondent in an attorney disciplinary proceeding may refuse to answer questions on the grounds that his answers may subject him to possible criminal liability. Although that decision has been subject to much criticism (see, *e.g.,* Underwood, *The Fifth Amendment and the Lawyer,* 62 Nw. U.L. Rev. 129 (1967)), it is nonetheless the supreme law of the land and is therefore binding upon this court. *Martin v. Hunter's Lessee* (1816), 14 U.S. (1 Wheat.) 304, 4 L. Ed. 97.

Like "[a] nod or a head-shake," a request for the admission of facts and genuineness of documents "is as much a 'testimonial' or 'communicative' act in this sense as are spoken words" and therefore may not be compelled. See *Schmerber v. California* (1966), 384 U.S. 757, 762 n.5, 16 L. Ed. 2d 908, 914 n.5, 86 S. Ct. 1826, 1830 n.5.

Only if the respondent were immunized against both the direct use as well as the derivative use of his testimony could he be compelled to testify. (See, *e.g., Lefkowitz v. Turley* (1973), 414 U.S. 70, 38 L. Ed. 2d 274, 94 S. Ct. 316; *Kastigar v. United States* (1972), 406 U.S. 441, 32 L. Ed. 2d 212, 92 S. Ct. 1653.) Derivative use would include information obtained as a result of the respondent's answers to a request for the admission of facts and genuineness of documents. Rule 216(e) contains no such prohibition against derivative use (and the hearing panel had no power to confer the necessary immunity), but subsection (c)(2) of Rule 216 expressly provides for objections based upon "privilege." "Accordingly objections based on the self-incrimination privilege are available." (8 C. Wright & A. Miller, Fed. Prac. & Proc. sec. 2262, at 735 (1970). Accord, *Gordon v. FDIC* (D.C. Cir. 1970), 427 F. 2d 578, 581.) While the foregoing authorities deal with the Federal rule on which our Rule 216 is based (see Ill. Ann. Stat., ch. 110A, par 216, Historical & Practice Notes (Smith-Hurd 1968)), the outcome is identi-

cal under the Illinois rule. See Keegan, *Privileged Matters and Protective Orders,* 1959 U. Ill. L.F. 801, 802 (privilege against self-incrimination available as an objection to a request for admissions under predecessor of Rule 216).

That the subjects of the request primarily were documents whose authenticity might otherwise have been proved did not take the request outside the scope of the privilege. A respondent may not be forced to give testimonial evidence which may provide any of the "links" in the chain leading to criminal prosecution. See, *e.g., Hoffa v. United States* (1966), 385 U.S. 293, 17 L. Ed. 2d 374, 87 S. Ct. 408.

The majority glosses over this problem by citing authority for the true but irrelevant proposition that attorney disciplinary proceedings are "remedial" rather than criminal in nature. (See *In re Daley* (7th Cir. 1977), 549 F.2d 469, *cert. denied* (1977), 434 U.S. 829, 54 L. Ed. 2d 89, 98 S. Ct. 110.) The issue in this case, however, is not whether the defendant has been forced to "incriminate" himself in these proceedings but, rather, whether the respondent has been unconstitutionally penalized, by these proceedings, for his perfectly legitimate refusal to provide evidence which might incriminate him in other proceedings. (*Spevack v. Klein; Lefkowitz v. Turley* (1973), 414 U.S. 70, 38 L. Ed. 2d 274, 94 S. Ct. 316; see also *United States v. Kordel* (1970), 397 U.S. 1, 25 L. Ed. 2d 1, 90 S. Ct. 763.) The majority, in effect, concedes that respondent was thus unconstitutionally penalized and that the proper procedure would have been to grant the respondent use and derivative use immunity. However, the majority apparently assumes that this was "harmless error" in light of the additional evidence adduced with regard to these counts. I do not agree. The nature of the transactions at issue here was hotly disputed, and it defies credulity to suggest that the Hearing Board (which expressly stated that it *would* take the matters deemed admitted into

consideration) did not consider these improperly admitted matters in evaluating respondent's conduct and credibility. Although neither this court nor the Review Board was bound by the findings of the Hearing Board, neither tribunal provided a *de novo* review of the Hearing Board's proceedings adequate to purge the taint therein. Accordingly, by imposing a sanction based in part upon the counts which were the subject of the Administrator's request for admissions, this court has unconstitutionally penalized the respondent for his assertion of privilege in response to that request. *Spevack v. Klein.* See also *In re Holland* (1941), 377 Ill. 346 (no sanction for good faith assertion of privilege).

The abuse of the respondent's rights did not end with the improper admission of the aforementioned matters. At the conclusion of the Administrator's case the chairman of the hearing panel made the following statement to respondent:

> "If you propose to become a witness as to any of these complaints you will have waived your privilege as to those complaints, and *I look somewhat askant at you* now taking that position after having claimed the privilege when Mr. O'Malley wanted to put it in his case, because his case might have been totally different." (Emphasis added.)

Forcing a respondent to choose between testifying before he has heard all of the other evidence and not testifying at all violates his privilege against self-incrimination. (*Brooks v. Tennessee* (1972), 406 U.S. 605, 610, 32 L. Ed. 2d 358, 362, 92 S. Ct. 1891, 1898.) In *Brooks,* the Supreme Court struck down a statute requiring a defendant to choose between testifying at the beginning of his own case and not testifying at all. The court explained:

> "Pressuring the defendant to take the stand, by foreclosing later testimony if he refuses, is not a constitutionally permissible means of insuring his honesty. It fails to take into account the very real

and legitimate concerns that might motivate a defendant to exercise his right of silence. And it may compel even a wholly truthful defendant, who might otherwise decline to testify for legitimate reasons, to subject himself to impeachment and cross-examination at a time when the strength of his other evidence is not yet clear. For these reasons we hold that [the statute] violates an accused's constitutional right to remain silent insofar as it requires him to testify first for the defense or not at all." 406 U.S. 605, 611-12, 32 L. Ed. 2d 358, 363, 92 S. Ct. 1891, 1895.

The facts of this case reveal an even more serious violation, in that the Hearing Board would have had the respondent testify even earlier than was required by the statute found unconstitutional in *Brooks*.

Given the Hearing Board's power to recommend sanctions which would gravely impact and perhaps terminate the respondent's professional career, the chairman's above-quoted statement cannot be assumed to have been taken lightly by the respondent, and therefore ought not be overlooked by this court. That statement only can be interpreted to mean that the respondent would be penalized for his assertion of privilege by being forced to choose between not testifying, and having the chairman "look askant" at him, *i.e.,* "with disapproval or distrust: suspiciously" (Webster's Third New International Dictionary 128 (1971) (definition of *askance*)).

The impact of this error was far more serious than a minor, technical one from which no prejudice results. (*Cf. In re Damisch* (1967), 38 Ill. 2d 195.) The evidence against the respondent (other than the improperly admitted documents) consisted primarily of the testimony of individuals as to their conversations and transactions with the respondent. Respondent's testimony might have shed an entirely different light upon those conversations and

transactions, demonstrating a different degree of, or perhaps even the complete absence of, misconduct on his part. Thus, the chairman's statement rendered the respondent's assertion of privilege impermissibly "costly" (*Spevack v. Klein; cf. In re Holland* (1941), 377 Ill. 346 (no sanction for good faith assertion of privilege)), and it is inappropriate for us to rely upon this record to impose a sanction with regard to the remaining part of count III, as well as with regard to counts IV through VII.

Respondent's own statements before us, and in documents filed in this court, form an adequate basis for the imposition of a sanction with regard to count IX, however. The respondent wilfully failed to comply with a subpoena issued by the clerk of this court. That wilful failure was based solely on the respondent's own opinion that it was not necessary for him to comply, and is therefore inexcusable. While the respondent may have had a colorable argument with regard to the applicability of the privilege against self-incrimination to the documents subpoenaed, as an experienced attorney he knew that the proper means of asserting that privilege was through a timely motion to quash the subpoena. Respondent did not move to quash the subpoena until four months after he was served with it (and over three months after it was returnable). His assertion of privilege in response to the subpoena therefore was outrageously untimely, and his brief periods of illness during this delay cannot fully excuse this misconduct. Thus, only with regard to this count do I agree a sanction may be imposed.

While I recognize that reasonable people may differ with regard to whether I or my colleagues have correctly determined whether the violations of respondent's rights were harmless, I do not see any room for disagreement as to the existence of such violations. Therefore I respectfully dissent from my brothers' disposition of this case.